**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MARK BALENTINE and LASEANT )
SARDIN, on behalf of themselves and )
all other similarly situated laborers, )
known and unknown, )
                                    )    Case No.
                Plaintiffs, )
                                    )    Judge:
v. )
                                    )    Magistrate Judge:
WALMART, INC., )
                                    )
                Defendants.

## CLASS ACTION COMPLAINT

Plaintiffs Mark Balentine and Laseant Sardin, on behalf of themselves and all other persons similarly situated, known and unknown, for their Complaint against Defendant Walmart, Inc. ("Walmart") state as follows:

### NATURE OF THE CASE

### I.    INTRODUCTION

1.    Plaintiffs are two former logistics workers, both of whom were employed for years loading, unloading, and inspecting goods at a Walmart distribution center in Elwood, Illinois.

2.    Plaintiffs were employed to work facilitating the shipping of Defendant Walmart's goods from a critical logistics hub through a third-party, Schneider Logistics, alongside hundreds of other workers.

3.    Plaintiffs are two Black men, both of whom have criminal records. Both secured and maintained employment at Schneider Logistics moving Walmart goods for years without significant issues.

1

4.     For reasons unknown to Plaintiffs, Walmart sought to bring distribution center employees under its control.

5.     As part of this process, Walmart required long-time logistics workers to renew their employment in similar or identical positions, but as Walmart employees.

6.     As part of this process, Defendant engaged in a vetting process which included a criminal record screening.

7.     Plaintiffs, alongside a class of similarly situated Schnieder Logistics workers who sought to continue their positions as Walmart employees, were then not re-hired or were offered positions only to have those offers revoked soon after based on their criminal records.

8.     Plaintiffs and a similarly situated class of workers were thereby effectively terminated from jobs they had performed for months or years based on the arbitrary, discriminatory use of criminal records screening by Walmart.

9.     The experience of the Plaintiffs and class members in this case is illustrative of the harms of discriminatory records checks and the absurdity of justifications for their use based on "business necessity."

10.     Plaintiffs' claims further demonstrate that "the use of criminal background checks" — like those at Walmart and other companies — "disproportionately excludes Black people from employment."[1]

---

[1] Rachel Keinman and Sandhya Kajeepeta, *Barred from Work: The Discriminatory Impacts of Criminal Background Checks in Employment*, Thurgood Marshall Institute: Economic Justice No. 27, 4 (Apr. 2023)
https://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID4721988_code6341942.pdf?abstractid=4721988&mirid=1.

11.     In addition to the disparate impact on Black workers who were fired due to Walmart's use of criminal record screening, Walmart engaged in disparate treatment of Black workers with criminal records by, among other things, retaining non-Black Schneider Logistics workers with criminal records.

12.     Plaintiffs bring class claims to challenge and seek relief from Walmart's discriminatory use of criminal records screenings. These screenings perpetuate proven racial discrimination in the criminal legal system by transposing its disparities onto job applicants, including those who have shown previously that they can do the job they seek.

13.     Plaintiffs therefore seek monetary damages, injunctive relief, and declaratory relief on behalf of themselves and all other Black applicants to Walmart previously employed by Schneider Logistics and sought employment as Walmart employees at Walmart Distribution Center #7078 in Elwood, Illinois.

## II.    JURISDICTION AND VENUE

14.     Plaintiffs bring this action pursuant to Title VII of the Civil Rights Act of 1964, § 2000e.

15.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331.

16.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b), (c), and (d) because Defendants maintain offices and transact business within this district, or at all relevant times, have maintained offices in this district and have transacted business within this district, or because a substantial portion of events and facts giving rise to Plaintiffs' claims occurred in this district.

## III.   PARTIES

17.    Plaintiff Mark Balentine is a Black/African American man who at all relevant times has:

      a.  resided and lived in this judicial district;

      b.  been a "person" as defined by 42 U.S.C. § 2000e; and

      c.  been an "applicant for employment" under 42 U.S.C § 2000e-2.

18.    Plaintiff Laseant Sardin is a Black/African American man who at all relevant times has:

      a.  resided and lived in this judicial district;

      b.  been a "person" as defined by 42 U.S.C. § 2000e; and

      c.  been an "applicant for employment" under 42 U.S.C. § 2000e-2.

19.    Defendant Walmart, Inc. has at all relevant times:

      a.  been a corporation organized under the laws of the State of Delaware; and

      b.  been an "employer" as defined by 42 U.S.C. § 2000e.

## IV.   FACTUAL BACKGROUND

### a.  Employment by Schneider Logistics at Walmart's Elwood, IL Distribution Center

20.    In 2006, Walmart opened its sprawling 3.4 million square foot distribution center — Distribution Center #7078 — in Elwood, Illinois (hereafter "the Walmart Distribution Center").[2]

---

[2]Rebecca Burns, *Black Workers Say Walmart's Background Checks Are Racially Discriminatory*, IN THESE TIMES (Apr. 25, 2019), https://inthesetimes.com/article/lawsuit-background-checks-racial-discrimination-walmart-black-workers.

21.     The Walmart Distribution Center is vital to Walmart's Midwest operations, serving as a central hub for products before they are shipped to the company's area retail facilities.

22.     From the time it was opened through 2019, the Walmart Distribution Center was operated by third-party logistics company Schneider Logistics ("Schneider"). Virtually the entire workforce at the Walmart Distribution Center, nearly six hundred (600) workers, were Schneider employees.

23.     Starting in 2016, Plaintiff Balentine began working at the Walmart Distribution Center through Schneider first as a Picker and then as a Quality Assurance Associate.

24.     In this role, Plaintiff Balentine was tasked with inspecting products to ensure that they met established quality standards before departing the Walmart Distribution Center for their final retail destinations.

25.     Plaintiff Balentine worked at the Walmart Distribution Center for nearly three (3) years.

26.     Also in 2016, Plaintiff Sardin began his employment with Schneider at the Walmart Distribution center as a Loader.

27.     Plaintiff Sardin carried out a variety of logistical duties, including activities related to shipping and receiving packages and loading and unloading products.

28.     Plaintiff Sardin worked at the Walmart Distribution Center for over two (2) years.

### b. Walmart Ends its Relationship with Schneider Logistics and Employees Reapply for Their Positions

29.     In January 2019, Walmart announced that it was ending its contract with Schneider and would begin direct management and control of operation of the Walmart Distribution Center effective April 6, 2019.[3]

30.     Walmart stated that it planned to hire "as many people as possible" from the group of approximately six hundred (600) Schneider employees working at the Walmart Distribution Center.[4]

31.     Walmart informed Mr. Balentine, Mr. Sardin, and the other Schneider employees that they would have to reapply for their jobs to continue working at the Walmart Distribution Center.

32.     Plaintiffs Balentine and Sardin were excited at the prospect of continued employment at the Walmart Distribution Center with the attendant higher pay and benefits of direct Walmart employees.

33.     Around February 2019, Mr. Balentine applied to work for Walmart as a Quality Assurance Associate at the Walmart Distribution Center.

34.     The Quality Assurance Associate position involved the very same tasks that Mr. Balentine had been carrying out as an employee of Schneider Logistics for nearly three (3) years.

35.     Mr. Balentine was qualified for the Quality Assurance Associate position.

---

[3] Bob Okon, *Breaking: Walmart taking over Elwood warehouse; 589 workers* affected, SHAW LOCAL NEWS NETWORK (Jan 25, 2019 at 12:36 pm), https://www.shawlocal.com/2019/01/25/breaking-walmart-taking-over-elwood-warehouse-589-workers-affected/a3e30ec/.
[4] *Id.*

6

36.     Mr. Balentine was interviewed for the Quality Assurance Associate position.

37.     Following his interview, Mr. Balentine was offered, and accepted, a position with Walmart as a Quality Assurance Associate.

38.     Around February 2019, Mr. Sardin applied to work for Walmart as a Loader at the Walmart Distribution Center.

39.     The Loader position involved the very same tasks that Mr. Sardin had been carrying out as an employee of Schneider Logistics for over two (2) years.

40.     Mr. Sardin was qualified for the Loader position.

41.     Mr. Sardin was interviewed for the Loader position.

42.     Following the interview, Mr. Sardin was offered, and accepted, a position with Walmart as a Loader.

### c.  Walmart Conducts Criminal Background Checks

43.     In February 2019, after Plaintiffs accepted their positions, Walmart informed the Plaintiffs that they would be required to undergo criminal background checks to continue working at the Walmart Distribution Center.

44.     After accepting a position with Walmart, Plaintiff Balentine consented to a criminal background check.

45.     In authorizing Walmart to conduct a comprehensive criminal background check, Mr. Balentine knew that the background check would reveal all his past convictions.

46. After authorizing a criminal background check, Mr. Balentine was contacted by First Advantage, the firm providing criminal background check services for Walmart.

47. First Advantage informed Mr. Balentine that its background check had revealed past criminal convictions.

48. Mr. Balentine then contacted First Advantage to supply further information about his criminal record, including explaining that all offenses on his criminal record were over a decade old.

49. In his phone conversation with a representative of First Advantage, the representative told Mr. Balentine that Walmart was refusing to hire him because he had two felony convictions on his record.

50. In March 2019, Walmart informed Mr. Balentine that he would not be permitted to work at the Walmart Distribution Center due to the results of the criminal background check.

51. After accepting a position with Walmart, Mr. Sardin also consented to a criminal background check.

52. In authorizing Walmart to conduct a comprehensive criminal background check, Mr. Sardin knew that the background check would reveal all his past convictions.

53. After authorizing a criminal background check, Mr. Sardin was contacted by First Advantage.

54. First Advantage informed Mr. Sardin that its background check had revealed past criminal convictions.

55.    Mr. Sardin then took the initiative to call Walmart directly to provide additional information about his criminal record. When Walmart directed him to provide such information to First Advantage, he called First Advantage and supplied a detailed explanation of the offenses contained on his criminal background report — all of which except for two minor misdemeanor offenses were more than a decade old.

56.    In March 2019, Walmart informed Mr. Sardin that he would not be permitted to work at the Walmart Distribution Cetner due to the results of the criminal background check.

### d. Disparate Impact of Walmart's Criminal Background Policy on African American Applicants

57.    In 1991, Congress Amended Title VII of the Civil Rights Act to explicitly prohibit "employment practice[s] that cause[] a disparate impact on the basis of race, color, religion, sex, or national origin" where an employer "fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i).

58.    The use of criminal background check policies by employers can severely limit the employment prospects of African American applicants and other racial groups, who are more likely to possess criminal records compared to their non-Black counterparts.

59.    In the United States, between 70 and 100 million people have some type of criminal record.[5]

---

[5] U.S. Commission on Civil Rights, *Collateral Consequences of Conviction: The Crossroads of Punishment, Redemption, and the Effects on Communities*, 9 (Jun. 2019), https://www.usccr.gov/files/pubs/2019/06-13-collateral-consequences.pdf.

60.     The likelihood an individual has a criminal record is unequally distributed across demographics and builds from disparities in the U.S. criminal justice system, where Black men are six times more likely to be incarcerated than White men.[6]

61.     Disparities in incarceration "exist for both the least and most serious offenses."[7]

62.     Locally, criminal records disparities also disproportionately impact Black individuals as compared to other groups, where, of the more than 3 million criminal cases filed in Cook County, Illinois between 2000 and 2018, "60% of those were filed against Black people."[8]

63.     In Will County, where the Walmart Distribution Center is located, Black residents make up 52% of the jail population despite making up only 13% of the resident population.[9]

64.     As a result, Black individuals are more likely to have criminal records than other groups.[10]

---

[6] E Anne Carson and Daniela Golinelli, Bureau of Justice Statistics, *Prisoners in 2012*, 25 (2013), http://www.bjs.gov/content/pub/pdf/p12tar9112.pdf.

[7] The Sentencing Project, REPORT OF THE SENTENCING PROJECT TO THE UNITED NATIONS SPECIAL RAPPORTEUR ON CONTEMPORARY FORMS OF RACISM, RACIAL DISCRIMINATION, XENOPHOBIA, AND RELATED INTOLERANCE: REGARDING RACIAL DISPARITIES IN THE UNITED STATES CRIMINAL JUSTICE SYSTEM 9 (2018), https://www.sentencingproject.org/wp-content/uploads/2018/04/UN-Report-on-Racial-Disparities.pdf.

[8] Josh McGhee and Jared Rutecki, Injustice Watch, *Fewer people in Cook County are being charged with crimes. Why are Black people making up a larger share of defendants?* (Dec. 1, 2021), https://www.injusticewatch.org/project/the-circuit/2021/the-circuit-racial-disparities-explainer/.

[9] Vera Institute of Justice, Will County, IL, VERA INCARCERATION TRENDS, (Oct. 16, 2024 11:16 AM), https://trends.vera.org/state/IL/county/will_county.

[10] U.S. Commission on Civil Rights, *Collateral Consequences of Conviction: The Crossroads of Punishment, Redemption, and the Effects on Communities*, 42 (Jun. 2019), https://www.usccr.gov/files/pubs/2019/06-13-collateral-consequences.pdf.

65. "Given the overwhelming racial disparities at every level of the criminal legal system . . . employment practices screening out individuals with a criminal conviction will disproportionately impact Black applicants."[11]

66. Research has confirmed that disparate outcomes for Black applicants with criminal records are *compounded* at the hiring stage, with one study sample showing that "60 percent of all black applicants with criminal records did not receive callbacks or job offers, compared to 30 percent of all white applicants with criminal records."[12]

67. Walmart employed an overly restrictive criminal background check policy when considering applications for employment from Plaintiffs and other Schneider employees.

68. Applying for jobs that did not require highly specialized skills or education, Plaintiffs and other Black/African American Schneider employees were disproportionately likely to possess criminal backgrounds when compared to their White counterparts.

69. As such, Walmart's conduct in applying overly restrictive criminal background criteria when considering applications for positions at the Walmart Distribution Center had a disparate impact on Black/African American Schneider employees.

---

[11] Rachel Keinman and Sandhya Kajeepeta, *Barred from Work: The Discriminatory Impacts of Criminal Background Checks in Employment*, Thurgood Marshall Institute: Economic Justice No. 27, 6 (Apr. 1, 2023), https://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID4721988_code6341942.pdf?abstractid=4721988&mirid=1.

[12] Devin Pager, Bruce Western, & Namo Sugie, *Sequencing Disadvantage: Barriers to Employment Facing Young Black and White Men with Criminal Records*, 623 ANN. AM. ACAD. POL SOC SCI 199 (2009).

70.     Among the ways that Walmart's criminal background policy is overly broad and restrictive is that it fails to include any meaningful individual assessment of applicants' criminal records.

71.     All decisions regarding eligibility of employment for applicants with criminal records are made in a centralized location at Walmart's Home Office in Bentonville, Arkansas, which applies a set of uniform criteria to its decision making.

72.     Walmart does not involve individual hiring managers, such as the individual hiring managers that interviewed Plaintiffs and other Schnieder employees for positions at the Walmart Distribution Center, when determining whether to disqualify applicants based on their criminal records.

73.     Walmart failed to conduct an individual assessment of Plaintiffs' criminal backgrounds, including by failing to take into consideration the fact that they had been successfully performing the very same jobs for which they applied and the relevance to their criminal backgrounds to the positions in question.

74.     On information and belief, Walmart similarly failed to conduct an individual assessment of other African American applicants who worked at the Walmart Distribution Center through Schnieder, including by failing to take into consideration the fact that they had been successfully performing the very same jobs for which they applied and the relevance to their criminal backgrounds to the positions in question.

75.     Additionally, Walmart's criminal background check policy is overly restrictive because it renders ineligible any applicant who does not fully disclose their conviction history.

76. Using self-disclosure of criminal history — including as a memory or integrity test — is not job-related or consistent with business necessity.

77. Any such policy has had a severe disparate impact on African Americans, a protected group more likely to have criminal histories and so more likely to "fail the test."

78. Walmart's policy and/or practice related to criminal background checks had a disparate impact on Plaintiffs and a class of similarly situated African American applicants who worked for the Walmart Distribution Center through Schneider.

79. Walmart's overbroad criminal record policy had the effect of denying employment to approximately fifty (50) other qualified African American applicants who had worked for the Walmart Distribution Center through Schneider.

**e. Disparate Treatment of Black Applicants with Criminal Records**

80. In addition to suffering disparate impact discrimination as a result of Defendant's criminal record screening policy and practice, Plaintiffs suffered disparate treatment discrimination.

81. Plaintiffs and class members, African American Schneider applicants with criminal records, were not selected for continued employment with Walmart after criminal record screenings.

82. Similarly situated Schneider applicants with criminal records who are not African American, however, were selected for positions and continued to work under Walmart's control following the implementation of Walmart's criminal record screening policy and practices.

13

83.     Defendant's practice of denying African American individuals with criminal records continued employment while re-hiring individuals with criminal records who are not African American denied employment to approximately fifty (50) qualified African American applicants who had worked for the Walmart Distribution Center through Schneider as a result of disparate treatment.

84.     Defendant knew that its criminal record screening policy and/or practice would have a disproportionate impact on African American applicants who had worked for the Walmart Distribution Center through Schneider.

85.     Defendant knew that its criminal record screening policy and/or practice would discriminate against African American applicants who had worked for the Walmart Distribution Center though Schneider. Defendant, through its criminal record screening policy and/or practice, intentionally discriminated against African American applicants.

### f. Administrative Posture

86.     Plaintiffs have exhausted administrative remedies available to them as persons seeking relief under Title VII of the Civil Rights Act.

87.     Mark Balentine filed a charge with the EEOC on April 22, 2019, alleging employment discrimination against Walmart on behalf of himself and similarly situated workers.

88.     Laseant Sardin filed a charge with the EEOC on April 22, 2019, alleging employment discrimination against Walmart on behalf of himself and similarly situated workers.

89.     On January 31, 2025, the EEOC issued a determination of reasonable cause as to Mark Balentine's class wide disparate impact and disparate treatment racial discrimination claims.

90.     On January 31, 2025, the EEOC issued a determination of reasonable cause as to Laseant Sardin's class wide disparate impact and disparate treatment racial discrimination claims.

91.     On April 8, 2025 EEOC District Director Amrith Kaur Aakre issued a letter stating that "[t]he EEOC found reasonable cause to believe that violation of [Title VII] occurred with respect to some or all of the matters alleged" in Mark Balentine's Charge, and issued a notice of a right to sue to Mr. Balentine.

92.     On April 8, 2025 EEOC District Director Amrith Kaur Aakre issued a letter stating that "[t]he EEOC found reasonable cause to believe that violation of [Title VII] occurred with respect to some or all of the matters alleged" in Laseant Sardin's Charge, and issued a notice of a right to sue to Mr. Sardin.

93.     By virtue of their timely filed administrative charges, receipt of right to sue letters from the relevant agency, and timely filings in this case, Plaintiffs have fulfilled all conditions precedent to the instant Complaint.

## V.     CLASS ACTION ALLEGATIONS

94.     Plaintiffs bring this case as a proposed class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and others similarly situated.

95.     Plaintiffs bring this class action pursuant to Rule 23(a), (b)(2), and/or (c)(4) seeking injunctive and declaratory relief.

15

96. Plaintiffs also bring this class action pursuant to Rule 23(a), (b)(3), and/or (c)(4) seeking backpay, monetary damages, and other make-whole relief.

97. Plaintiffs assert their First Cause of Action/Count against Walmart on behalf of the "Schneider Disparate Impact Class" defined as follows: "All African American applicants with criminal records formerly employed by Schneider Logistics and denied employment at Walmart Distribution Center #7078 in Elwood, Illinois due to Walmart's criminal record screening policy and practices."

98. Plaintiffs assert their Second Cause of Action/Count against Walmart on behalf of the "Schneider Disparate Treatment Class" defined as follows: "All African American applicants with criminal records formerly employed by Schneider Logistics and denied employment at Walmart Distribution Center #7078 in Elwood, Illinois due to disparate treatment through Walmart's criminal record screening policy and practices due to their race as African Americans."

99. Together, the "Schneider Disparate Impact Class" and "Schneider Disparate Treatment Class" are the "Classes."

100. The members of the Classes are collectively referred to as "Class Members."

101. Plaintiffs reserve the right to amend the definition of above-defined Classes based on discovery or legal developments.

102. The Class Members identified herein are so numerous that joinder of all members is impracticable. The number of applicants harmed by Walmart's violations of the law is far greater than feasibly could be addressed through joinder. The precise number is uniquely within Walmart's possession, and Class Members may be notified of the pendency of this action by published, mailed/or e-mailed notice.

103. There are questions of law and fact common to Class Members, and these questions predominate over any questions affecting only individual members. Common legal and factual questions include, among others:

    a. Whether Defendant has or has had a policy or pattern and practice in place related to criminal records and hiring that has resulted in disparate impact discrimination against African American Schneider employees;

    b. Whether Defendant has or has had a policy or pattern and practice in place related to criminal records and hiring that has resulted in disparate treatment discrimination against African American Schneider employees;

    c. Whether Defendant provided First Advantage with unlawful instructions that resulted in racial discrimination against African American Schneider employees when retaining First Advantage to conduct criminal background checks of Schneider employees; and

    d. Whether the conduct complained of herein constitutes a violation of Title VII.

104. Plaintiffs are members of the Classes they seek to represent. Walmart took discriminatory adverse action against Plaintiffs based on race and based on the pretext of their criminal records.

105. Plaintiffs' claims are typical of the claims of the Classes they seek to represent, because Plaintiffs: were employed by Schneider logistics at the time they applied for positions with Walmart; applied for positions at Walmart at a Walmart distribution center; were subjected to the challenged criminal history screening process for applicants; and were denied positions with Walmart due to the results of their

criminal background checks. This claim is shared by each Class Member. Upon information and belief, it is Walmart's standard practice to take adverse actions against applicants based on criminal history in a manner that is discriminatory, not job related, inconsistent with business necessity, and otherwise not related to an applicant's suitability for employment.

106. Plaintiffs will fairly and adequately represent and protect the interests of Class Members because their interests coincide with, and are not agnostic to, the interests of the Class Members they seek to represent. Plaintiffs have retained counsel who are competent and experienced in complex class actions, including litigation pertaining to Title VII, criminal background checks, and other employment litigation, and the intersection thereof. There is no conflict between Plaintiffs and the Class Members.

107. A class action is superior to other available methods for the fair and efficient adjudication of this litigation. Class Members have been damaged and are entitled to recovery as a result of Walmart's uniform policies and practices. Walmart has acted and/or refused to act on grounds generally applicable to the Class Members, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the Class Members as a whole. Because Walmart has maintained a common policy of denying employment to individuals with criminal histories but may not have explained that policy to all Class Members, many Class Members may be unaware that their rights have been violated. Judicial economy will be served by the maintenance of this lawsuit as a class action, in that it is likely to avoid the burden which would otherwise be placed on the judicial system by the filing of many similar lawsuits by individually harmed persons.

There are no obstacles to the effective and efficient management of this lawsuit as a class action.

## CLAIMS FOR RELIEF

## <u>COUNT ONE</u>

**Disparate Impact Discrimination**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.***
**(On behalf of Plaintiffs and the Schneider Disparate Impact Class)**

108.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

109.    Plaintiffs bring this claim on their own behalf and on behalf of the Schneider Disparate Impact Class.

110.    Plaintiffs timely filed a charge with the Equal Employment Opportunity Commission ("EEOC") with class-wide allegations and received Right to Sue letters and have therefore exhausted requisite administrative remedies.

111.    Walmart's policy and/or pattern or practice of denying employment to individuals with criminal records — including Schneider employees who had job offers revoked due to alleged omissions or errors in self-disclosures of their criminal histories — had a disparate impact on African American workers and was neither job related nor consistent with business necessity.

112.    Even if Walmart's policy and practice of denying employment opportunities to individuals with criminal convictions — including Schneider employees who had job offers revoked due to alleged omissions or errors in self-disclosures of their criminal histories — could be explained as a business necessity, less discriminatory alternatives exist that would have equally served said business necessity.

19

113. Walmart's conduct caused and continues to cause Plaintiffs and the members of the Schneider Disparate Impact Class losses in earnings and other employment benefits.

114. Plaintiffs and the Schneider Disparate Impact Class also seek injunctive and declaratory relief to correct Walmart's discriminatory policies and practices.

## COUNT TWO

**Disparate Treatment Discrimination**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.***
**(On behalf of Plaintiffs and the Schneider Disparate Treatment Class)**

115. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

116. Plaintiffs bring this claim on their own behalf and on behalf of the Schneider Disparate Treatment Class.

117. Plaintiffs timely filed a charge with the Equal Employment Opportunity Commission with class-wide allegations and received Right to Sue letters and have therefore exhausted requisite administrative remedies.

118. Walmart's policy and practice of denying employment to Black job applicants with criminal records — including Schneider employees who had job offers revoked due to alleged omissions or errors in self-disclosures of their criminal histories — while hiring and continuing to employ non-African American job applicants who also had and disclosed criminal records was unlawful disparate treatment of African American workers which was neither job related nor consistent with business necessity.

119. Even if Walmart's policy and practice of denying employment opportunities to Black applicants with criminal convictions — including Schneider employees who had

job offers revoked due to alleged omissions or errors in self-disclosures of their criminal histories — while hiring and continuing to employ non-Black applicants who also had and disclosed criminal records could be explained as a business necessity, a less discriminatory alternatives exist that would have equally served said business necessity.

120. Walmart's conduct caused and continues to cause Plaintiffs and the members of the Schneider Disparate Treatment Class losses in earnings and other employment benefits.

121. Plaintiffs and the Schneider Disparate Treatment Class also seek injunctive and declaratory relief to correct Walmart's discriminatory policies and practices.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and Class Members pray for relief as follows:

   **a.** A declaratory judgment that the practices and policies described in this Complaint are unlawful and violate 42 U.S.C. §§ 2000e *et seq*.;

   **b.** A preliminary and permanent injunction against Walmart and all officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies and practices complained of herein;

   **c.** Certification of the case as a class action on behalf of the proposed Classes;

   **d.** Designation of Plaintiffs as representatives of the members of the Classes;

   **e.** Designation of Plaintiffs' counsel of record as Class Counsel;

f.   Reinstatement of Plaintiffs and Class Members to their positions at Walmart or in those positions equivalent at Walmart (i.e. reinstatement), or in lieu of reinstatements, an order for front pay benefits;

g.   An award of backpay;

h.   An award of nominal or exemplary damages;

i.   An award of costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

j.   Such other injunctive and declaratory or other relief that is necessary to correct Walmart's discriminatory policies and practices;

k.   Pre-judgement and post-judgment interest, as provided by law;

l.   Payment of a reasonable service award to Plaintiffs, in recognition of the services they rendered and will continue to render to Class Members; and

m.  Such other and further legal and equitable relief as this court deems necessary, just, and proper.


## JURY DEMAND

Plaintiffs demand trial by jury.


Dated: June 26, 2025                     Respectfully submitted,

*/s/ Kevin L. Herrera*

Kevin L. Herrera (ARDC # 6324045)
Mark H. Birhanu (ARDC # 6332462)
Jamitra Fulleord (ARDC # 6350435)
Esmeralda Limon (ARDC # 6349486)
Raise the Floor Alliance – Legal Dept.
1 N. LaSalle St., Ste 1275

22

Chicago, IL 60602
(312) 795-9115

Patrick Cowlin (ARDC # 6308800)
Nieves Bolaños (ARDC # 6299128)
Hawks Quindel S.C.
111 E. Wacker Dr, Ste 2300
Chicago, IL 60601
(312) 262-7517
pcowlin@hq-law.com
mnbolanos@hq-law.com